## In re WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION.

### In re Washington Mutual, Inc. Securities Litigation

This Document Relates to: All Cases.

Case Nos. 2:08–md–1919 MJP, C08–387 MJP.

United States District Court, W.D. Washington, at Seattle.

Oct. 27, 2009.

1202

James Abram Harrod, III, Robert Craig Finkel, Wolf Popper LLP, Jack Gerald Fruchter, Abraham Fruchter & Twersky LLP, Richard A. Speirs, Zwerling Schachter & Zwerling LLP, C. Chad Johnson, Gerald Harlan Silk, Hannah Green-wald Ross, Jerald Bien Willner, Katherine M. Sinderson, Bernstein Litowitz Berger & Grossmann, David H. Leventhal, Shane T. Rowley, Faruqi & Faruqi, James Abram Harrod, III, Robert Craig Finkel, Wolf Popper LLP, Jack Gerald Fruchter, Abraham Fruchter & Twersky LLP, Laurence Paskowitz, Paskowitz & Associates, Roy Laurence Jacobs, Roy Jacobs & Associates, Robert I. Harwood, Samuel K. Rosen, Harwood Feffer LLP, Marvin L. Frank, Murray Frank & Sailer, New York, NY, Darren J. Robbins, Robbins Geller Rudman & Dowd LLP, David C. Walton, Coughlin, Stoia Geller Rudman & Robbins LLP, Elizabeth P. Lin, Jon F. Worm, Timothy A. Delange, Beinstein Litowitz Berger & Grossmann LLP, Jofrey M. McWilliam, Byrnes & Keller, Darren J. Robbins, Robbins Geller Rudman & Dowd LLP, David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Samuel H. Rudman, Robbins Geller Rudman & Dowd LLP, Samuel H. Rudman, Robbins Geller Rudman & Dowd LLP, Melville, NY, Christopher Steven Jones, Joseph Edward White, Maya Susan Saxena, Saxena White PA, Charles W. Gerdes, Michael J. Keane, Keane Reese Vesely & Gerdes, St. Petersburg, FL, Deborah R. Gross, Law Offices Bernard M. Gross PC, Philadelphia, PA, Christopher Steven Jones, Joseph Edward White, Maya Susan Saxena, Saxena White PA, Boca Raton, FL, Jeffrey C. Grant, Aoki Sakamoto Grant, Seattle, WA, Mark Cotton Molumphy, Jordanna Thigpen, Cotchett Ptre & McCarthy, Joseph W. Cotchett, Mark Cotton Molumphy, Nanci E. Nishimura, Jordanna Thigpen, Cotchett Illston & Pitre, Burlingame, CA, Ariel Pierre Calonne, Office of the City Attorney, Ventura, CA, Reed R. Kathrein, Hagens Berman Sobol Shapiro LLP, Berkeley, CA, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Dan Drachler, Zwerling Schachter & Zwerling, Bradley S. Keller, Christina L.

Haring Larson, Lauren King, Byrnes & Keller, Roger M. Townsend, Breskin Johnson & Townsend PLLC, Derek W. Loeser, Erin Maura Riley, Lynn Lincoln Sarko, Amy C. Williams Derry, Elizabeth Ann Leland, Sarah Kimberly, Keller Rohrback L.L.P., Andrew M. Volk, Tyler Weaver, Hagens Berman Sobol Shapiro LLP, Duncan Calvert Turner, Allyssa Jayne Hale, Badgley Mullins Law Group, Steven Bert Frank, Frank Freed Subit & Thomas, Jeffrey C. Grant, Aoki Sakamoto Grant, Gretchen S. Obrist, Keller Rohrback, Seattle, WA, Peter Dexter St Phillips, Jr., Lowey Dannenberg Cohen PC, White Plains, NY, Abigail R. Romero, Jeffrey C. Block, Berman Devalerio Please Tabacco Burt & Pucillo, Boston, MA, Vahn Alexander, Faruqi & Faruqi, Los Angeles, CA, Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Pittsburgh, PA, Evan J. Smith, Brodsky & Smith, Bala Cynwyd, PA, Robert B. Weiser, Weiser Law Firm, Wayne, PA, David R. Scott, Scott & Scott LLP, Colchester, CT, Geoffrey M. Johnson, Scott & Scott LLP, Cleveland Heights, OH, Matthew K. Edling, Mark Cotton Molumphy, Jordanna Thigpen, Nanci E. Nishimura, Cotchett Ptre & McCarthy, Joseph W. Cotchett, Cotchett Illston & Pitre, Burlingame, CA, David Andrew Thorpe, Edward Dietrich, Matthew Philip Siben, Dietrich Siben Thorpe LLP, Carlsbad, CA, John Spencer Stewart, Robert B. Coleman, Thomas Ardell Larkin, Stewart Sokol & Gray, Portland, OR, Walter B. Hogan, Myrtle Point, OR, Ariel Pierre Calonne, Office of the City Attorney, Ventura, CA, for Plaintiffs.

Deborah L. Stein, Jonathan M. Weiss, K. Lucy Atwood, Nathan Agam, Barry Robert Ostrager, Simpson Thacher & Bartlett LLP, Dean Kitchens, Gabrielle Levin, Lindsay Rae Pennington, Gibson Dunn & Crutcher LLP, Deborah L. Stein, Jonathan M. Weiss, K. Lucy Atwood, Simpson Thacher & Bartlett LLP, James J. Farrell, Wendy Harper, Latham & Watkins LLP, Lindsay Rae Pennington, Dean Kitchens, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Stephen M. Rummage, Steven P. Caplow, Davis Wright Tremaine, David F. Taylor, Ronald L. Berenstain, Sean C. Knowles, Sarah Kate Vaughan, Perkins Coie, Paul J. Lawrence, K&L Gates LLP, Susan Anne Brye, Washington Mutual Bank, Barry M. Kaplan, Douglas W. Greene, Wilson Sonsini Goodrich & Rosati, Hozaifa Y. Cassubhai, Davis Wright Tremaine, Daniel J. Dunne, Jr., George E. Greer, Paul Francis Rugani, David S. Keenan, Orrick Herrington & Sutcliffe LLP, Sarah Kate Vaughan, Sean C. Knowles, William C. Rava, Ronald L. Berenstain, Sarah Kate Vaughan, Perkins Coie, Lynn M. Engel, Ralph H. Palumbo, Summit Law Group, Seattle, WA, Mary Kay Vyskocil, Simpson Thacher & Bartlett, Penny P. Reid, Jonathan D. Polkes, Lavell Malloy, Weil Gotshal & Manges, Corey E. Delaney, Kerry F. Cunningham, Patrick J. Smith, Richard F. Hans, DLA Piper US LLP, Darius P. Chafizadeh, Mary H. Mulhearn, Thacher Proffitt & Wood, Jonathan Dickey, Tina Samanta, Gibson Dunn & Crutcher LLP, Jonathan D. Polkes, Penny P. Reid, Lavell Malloy, Weil Gotshal & Manges, Barry Robert Ostrager, Simpson Thacher & Bartlett, Gabrielle Levin, Jonathan Dickey, Tina Samanta, Gibson Dunn & Crutcher LLP, New York, NY, Daniel W. Turbow, Jeffrey P. Palmer, Wilson Sonsini Goodrich & Rosati, Sally J. Berens, Gibson Dunn & Crutcher, Daniel W. Turbow, Wilson Sonsini Goodrich & Rosati, Sally J. Berens, Gibson Dunn & Crutcher, Palo Alto, CA, Anne E. Rea, Eric S. Mattson, Sidley Austin, Chicago, IL, Alison Killen Blair, Orrick Herrington & Sutcliffe, John S. Rossiter, Jr., Perkins Coie, Matthew D. Harrison, Peter Allen Wald, Samuel Lutz, Latham & Watkins, San Francisco, CA, for Defendants.

Monterey County Treasurer, pro se.

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

MARSHA J. PECHMAN, District Judge.

This matter comes before the Court on five motions to dismiss Plaintiffs' second amended consolidated class action complaint ("Complaint"). (Dkt. No. 293.)[1] The motions to dismiss have been filed by: (1) Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. Inc. ("Morgan Stanley"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Banc of America Securities LLC ("Banc of America"), J.P. Morgan Securities Inc. ("J.P.Morgan"), Barclays Capital Inc. ("Barclays"), Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette"), Cabrera Capital Markets LLC ("Cabrera Capital"), The Williams Capital Group, L.P. ("Williams Capital"), Citigroup Global Markets Inc. ("Citigroup"), Greenwich Markets, Inc. ("Greenwich"), BNY Capital Markets, Inc. ("BNY"), and Samuel A. Ramirez & Company Inc. ("Ramirez & Co.") (collectively, the "Underwriter Defendants") (Dkt. No. 310); (2) Defendant Deloitte and Touche LLP ("Deloitte") (Dkt. No. 313); (3) Defendants Thomas Casey, Stephen Rotella, Ronald Cathcart, David Schneider, John Woods, and Melissa Ballenger (Dkt. No. 316); (4) Defendants Anne Farrell, Stephen Frank, Thomas Leppert, Charles Lillis, Phillip Matthews, Regina Montoya, Michael Murphy, Margaret Osmer McQuade, Mary Pugh, William Reed, Jr., Orin Smith, James Stever, and Willis Wood, Jr. (collectively, the "Outside Director Defendants") (Dkt. No. 317); and (5) Defendant Kerry Killinger (Dkt. No. 321) (the court refers to Killinger, Casey, Rotella, Cathcart, Schneider, Woods, and Ballenger collectively as the "Officer Defendants").

Having reviewed the motions, Plaintiffs' responses (Dkt. Nos. 332, 333, 334, 335, 336), Defendants' reply briefs in support of their motions (Dkt. Nos. 338, 340, 341, 342, 343), and all papers in support thereof, and having heard oral argument from the parties on Tuesday, October 6, 2009 (see Dkt. No. 364), the Court makes the following rulings: (1) the Court DENIES in part and GRANTS in part Defendants' motions to dismiss Counts One, Two, and Three; and (2) the Court GRANTS in part and DENIES in part Defendants' motions to dismiss Counts Four, Five, and Six. The Court's reasoning is set forth below.

### Procedural History

On May 7, 2008, the Court consolidated three related securities class actions as part of a Multi–District Litigation proceeding against Defendants. (Dkt. No. 24.) Defendants filed their first round of motions to dismiss on December 8, 2008, and the Court heard argument on these motions on May 1, 2009. The Court dismissed Counts One, Two, and Three, and granted in part and denied in part Counts Four, Five, and Six. (Dkt. No. 277.) On June 15, 2009, Plaintiffs filed their second amended consolidated class action complaint. (Dkt. No. 293.) Defendants filed five separate motions to dismiss on July 17, 2009 and the Court heard oral argument on October 6, 2009.

### Legal Standard and Judicial Notice

The standards guiding this court's review of Plaintiffs' Complaint under Rule 12(b)(6) are set forth in the previous Order. (Dkt. No. 277 at 3.) After the Court issued its Order, the Supreme Court decided *Ashcroft v. Iqbal*, —— U.S. ——, 129

---

1. All citations to entries or filings on the docket refer to case number 2:08–md–1919 MJP. The page numbers refer to the docket number's pagination, not the pagination of the original filing.

S.Ct. 1937, 173 L.Ed.2d 868 (2009), which discusses Federal Rule of Civil Procedure ("Rule") 8(a)(2). *Iqbal* reaffirms the Supreme Court's decision in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and does not alter the standard the Court previously employed to test those claims in the Complaint subject to Rule 8. As before, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

Deloitte requests the Court judicially recognize excerpts of Washington Mutual, Inc.'s ("WaMu" or "the Company") amended 2005 Annual Report (Form 10–K/A) and WaMu's 2006 Annual Report (Form 10–K), to which Plaintiffs pose no objection. (Dkt. No. 313.) The Court will take notice of these documents and draw no inferences in favor of Defendants from judicially noticed facts. *See McGuire v. Dendreon Corp.,* No. C07–800MJP, 2008 WL 1791381, at *4 (W.D.Wash. Apr. 18, 2008). To the extent that Deloitte requests the Court judicially notice the Public Company Accounting Oversight Board's ("PCAOB") Release No. 2007–005, the request is denied. This document is not necessary to decide the issues presented in Deloitte's motion.

The Officer Defendants request the Court take judicial notice of a number of documents, which largely include SEC filings and conference call transcripts. (Dkt. No. 316.) Plaintiffs object to only one document, a "quasi-editorial *Wall Street Journal* article criticizing certain accounting rules." (Dkt. No. 333 at 9.) The Court will take no notice of this article (Dkt. No. 319–4 at 43–46), as it is not necessary to decide the issues presented. (*See* Dkt. No. 277 at 4.) The Court will take notice of the other items submitted by the Officer Defendants to which Plaintiffs do not object, and draw no inferences in Defendants' favor. (Dkt. Nos. 319–2, 319–3, 319–4 at 1–42.)

The Outside Directors ask the Court to take notice of the audit charters of three companies, DTS, Inc., VirnetX Holding Corp., and Morgan Stanley. (Dkt. No. 317 at 13.) Plaintiffs object and argue that these documents are not relevant to deciding the Outside Directors' motion. (Dkt. No. 335 at 7.) These documents are not necessary to decide the issues presented in the motion and the Court declines to afford them judicial notice.

Killinger requests the Court take judicial notice of 44 documents, including earnings call transcripts, conference call transcripts, and SEC filings, to which Plaintiffs object. (Dkt. No. 323; Dkt. No. 334 at 3.)[2] The Court takes notice of these documents, except Exhibits DD (*The New Yorker* article), GG (OTS release), HH (FFIEC press release), KK (FDIC quarterly), and MM (abstract related to FASB) of the Davis Declaration, which are not necessary to decide the issues presented in the motion.

## Discussion

Plaintiffs bring this action on behalf of a putative class of individuals who purchased securities issued by WaMu or its subsidiaries from October 19, 2005 to July 23, 2008 (the "Class Period"). Plaintiffs have substantially edited their initial Complaint, which lacked "proper structural organization and coherent pleading." (Dkt. No. 277 at 19.) Plaintiffs' amended Complaint is now 267 pages and 877 paragraphs, in

---

**2.** Killinger also provides the Court with documents that summarize and categorize allegations in the Complaint. (*See* Dkt. Nos. 321–2, 321–2.) The Court has conducted an independent review of the Complaint in its consideration of these motions and does not rely on these summaries and appendices.

which Plaintiffs present cogent and concise allegations against Defendants. As before, the Complaint asserts claims under §§ 10(b) and 20(a) of the 1934 Securities and Exchange Act (the "Exchange Act") and Rule 10b–5 promulgated under § 10(b) of the Exchange Act (Counts One, Two, and Three), and Claims under §§ 11, 12(a)(2) and 15 of the 1933 Securities Act (the "Securities Act") (Counts Four, Five, and Six).

Plaintiffs' allegations focus on WaMu's residential lending practice, which was WaMu's major "business driver and the source of 70% of WaMu's net interest income." (¶ 19.)[3] In an effort to increase net income, WaMu allegedly commenced a drive to originate more loans, which were either sold to third parties or kept in WaMu's held-for-investment portfolios. (¶¶ 17, 44.) To meet the demand for more loans, WaMu allegedly engaged in a host of improper activities that it hid from investors, and which caused WaMu's stock and securities to be artificially inflated. (*Id.*) Specifically, Plaintiffs allege that WaMu and Defendants: (1) deliberately and secretly decreased the efficacy of WaMu's risk management policies; (2) corrupted WaMu's appraisal process; (3) abandoned appropriate underwriting standards; and (4) misrepresented both WaMu's financial results and internal controls. (¶ 1.) The following paragraphs provide a brief summary of Plaintiffs' allegations.

Plaintiffs allege that WaMu relegated its risk management group to a "customer service" role to encourage loan volume at the expense of sound credit risk management. (¶ 3.) The Officer Defendants are alleged to have led this drive. (*Id.*) WaMu also allegedly pressured and hand-picked appraisers willing to abide by WaMu's dictates to inflate appraisal values for homes on which WaMu sold loans. (¶ 4.) This artificially lowered the loan-to-value ("LTV") ratio and created "the illusion of lower credit risk." (*Id.*) Confidential witnesses ("CWs") from various levels and geographic locations within the Company corroborate WaMu's lax underwriting guidelines, its practice of selling loans to borrowers with extremely low Fair Isaac Credit Organization ("FICO") credit scores, its failure to request documentation or verification of a borrower's stated income, and its habitual underwriting of Option Adjustable Rate Mortgages ("ARMs") to the introductory or "teaser" rate instead of the fully-indexed rate. (¶ 5.) WaMu also allegedly increased sales of Option ARM loans, which, though classified as "prime," led to high rates of default and negative amortization because they were improperly underwritten. (*Id.*) WaMu is also alleged to have increased its credit risk by causing the subprime underwriting guidelines to become "nearly nonexistent as underwriters were encouraged to allow exceptions to increasingly permissive standards." (*Id.*) These actions collectively increased WaMu's credit risk, which was not disclosed to the investing public.

Plaintiffs allege that WaMu misstated its financial condition and misled investors as to the condition of its internal controls. (¶ 6.) Generally accepted accounting principles ("GAAP") and SEC regulations required WaMu to "increase the Company's provision for its Allowance in a manner commensurate with the decreasing quality of its home mortgage products." (*Id.*) Plaintiffs allege that WaMu under-reserved for the increased credit risk it created as described above. (*Id.*) Plaintiffs allege further that WaMu's Loan Performance Risk Model ("LPRM"), used to determine the Allowance, did not take into account important credit risks, such as the

---

**3.** All paragraph citations refer to the Complaint (Dkt. No. 293).

potential for negative amortization from Option ARM loans and the increased credit risk from WaMu's permissive underwriting standards and distorted LTV ratios. (*Id.*) By under-provisioning its Allowance, WaMu misstated and artificially inflated its net income and earnings per share in each quarter of the Class Period. (*Id.*) Additionally, WaMu allegedly misrepresented the state of its internal controls, which were weakened in order to facilitate WaMu's reckless lending practice. (¶¶ 331–36.)

## I. PLAINTIFFS' EXCHANGE ACT CLAIMS

### A. *Count One: Section 10(b) of the Exchange Act*

Section 10(b) provides, in part, that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2009). Plaintiffs bring their § 10(b) claims for securities fraud against Defendants Killinger, Casey, Rotella, Cathcart, and Schneider. To state a claim, Plaintiffs must plead six elements as to each defendant: (1) a strong inference of scienter, (2) a material misrepre-

sentation or omission, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Defendants argue that the § 10(b) claims should be dismissed because the Complaint fails to allege the falsity of certain statements and particularized facts giving rise to a strong inference of scienter. (Dkt. Nos. 316, 321.) Because a § 10(b) claim alleges fraud, Plaintiffs must plead with particularity "the circumstances constituting the fraud...." Fed.R.Civ.P. 9(b). Additionally, under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff alleging securities fraud must "plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b). The required state of mind is scienter, defined as "deliberate[ ] reckless[ness] or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999).

The facts alleged in a complaint will give rise to a strong inference of scienter when the inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In evaluating scienter, the Court must consider the Complaint's allegations holistically, and take

note that "[v]ague or ambiguous allegations are now properly considered as a part of a holistic review...." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.2008). It is not sufficient to allege that corporate management was generally aware of the day-to-day operations without adding "some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir.2008). However, scienter may be inferred where Plaintiffs "offer details that would bridge the gap between the existence of ... reports [containing information contrary to public statements made by defendants] and actual knowledge on the part of the defendants." *South Ferry*, 542 F.3d at 783.

The Court's scienter analysis necessarily accompanies a review of the alleged false or misleading statements, because Plaintiffs must "adequately plead scienter in connection with those statements." *N.Y. State Teachers' Retirement Sys. v. Fremont Gen. Corp.*, No. 2:07–cv05756–FMC–FFMx, 2008 WL 4812021, at *5 (C.D.Cal. Oct. 28, 2008). The Ninth Circuit has observed that because falsity and scienter "are generally strongly inferred from the same set of facts, ... the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (internal quotation marks omitted).

Below, the Court addresses the statements of each Officer Defendant individually and examines whether Plaintiffs have sufficiently alleged falsity and scienter. Plaintiffs group the allegedly false statements in four categories: (1) risk management, (2) appraisals, (3) underwriting, and (4) financial statements and internal con-

trols. The Court's analysis tracks this division.

### 1. Kerry Killinger

Kerry Killinger was the CEO and Chairman of the Board of WaMu during the Class Period. (¶ 21.) Killinger joined WaMu in 1982 and in 2005 he hired and promoted Defendants Rotella, Cathcart, and Schneider to assist him in his effort to move WaMu into a "leading national position." (*Id.*) WaMu fired Killinger on September 8, 2008.(*Id.*)

#### a. Risk management

■ Plaintiffs accuse Killinger of making thirteen false and misleading statements throughout the Class Period that are allegedly actionable under § 10(b). (¶¶ 47–48, 50–60.) In late 2005, Killinger stated that the Company maintained "appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance," and provided "objective oversight of risk elements inherent in the Company's business activities and practices...." (¶ 47.)[4] In January 18, 2006, Killinger stated that "our risk management efforts are on track." (¶ 49.) On May 18, 2006, Killinger stated that "credit for us is [in] excellent shape, and I feel very comfortable with where we are from management of that credit as well as the reserving." (¶ 51.) Killinger then stated on September 6 or 7, 2006 that WaMu "began planning for [a slowdown in housing] quite some time ago [and] took a number of defensive actions." (¶ 53.) This, Killinger claimed, made WaMu "very well positioned, regardless of what happens in the housing market." (*Id.*) Killinger made nearly identical comments on October 18, 2006 and December 13, 2006. (¶¶ 54–55.) On January 17, 2007, Killinger stressed

4. Unless otherwise indicated, the Court has removed all emphasis added by Plaintiffs in their Complaint.

that WaMu had taken "decisive actions [that] ... positioned [it] well to deliver stronger operating performance in 2007." (¶ 56.)

Plaintiffs allege these statements are false and misleading because WaMu "had in fact weakened its risk management practices in order to increase loan volume." (¶ 62.) Plaintiffs support these allegations with internal memoranda and testimony from CWs spanning the Class Period. Plaintiffs allege that starting in "late 2005, WaMu's risk management operations were purposefully rolled back to such a degree that WaMu's risk management systems and personnel could no longer effectively protect the Company's investors from the increased risks that WaMu and the Officer Defendants" had created. (¶ 64.) This allegation is corroborated by CW 17, a Senior Vice President in WaMu's Enterprise Risk Management ("ERM") from August 2001 to September 2006, who states that Cathcart, with Senior Management's blessing, undertook to reduce ERM to an "advisory" only role. (¶ 65.) CW 18, Vice President in WaMu's Commercial Risk Department from April 2003 to June 2006, also testifies that in the Fourth Quarter 2005, WaMu's chief Enterprise Risk Officer, James Vanasek, "informed the Company's credit risk managers that WaMu's senior management ... had concluded that the Company planned to be more 'aggressive' in its lending and provisioning practices." (¶ 66.) An internal memo dated October 31, 2005 corroborates these CWs' statements, and details how "WaMu's risk management functions were being guided through a 'cultural change' and a 'behavioral change internally.'" (¶ 68.) WaMu's risk management was relegated to a "customer service" position that would not impose a "regulatory burden" on the Company. (*Id.*) Taken together, these allegations sufficiently show that Killinger's state-

ments made throughout the Class Period were false. (*See* ¶¶ 47–59.)

■ Defendants urge the Court to examine the "context" of each of the statements Killinger made to find that they were not misleading or false. (Dkt. No. 321 at 9–24; Dkt. No. 316 at 18–24.) Having reviewed the context, the Court does not find that it undermines Plaintiffs' allegations of falsity. The Court does agree with Defendants that Killinger's statement on September 10, 2007, that WaMu took "proactive steps" to prepare for the housing decline, is not sufficiently definitive to constitute an actionable, material misstatement. (¶ 60.) Defendants' motion is granted as to this statement.

■ Plaintiffs successfully raise a strong inference of scienter against Killinger. Plaintiffs allege that WaMu's Senior Vice Chairman of ERM complained to WaMu's Board, Killinger included, that the Company was taking on too much risk. (¶ 76.) Plaintiffs allege that monthly risk reports were distributed quarterly to WaMu's Board, including Killinger, which "specifically quantified the fact that the Company was exceeding certain risk parameters...." (¶ 78.) Killinger is also alleged to have received monthly risk reports from the Risk Analytics Group, detailing the Company's risk management processes. (¶ 88; *see* ¶¶ 90–94.) According to CW 79, who worked closely with Killinger as of July 2006, Killinger was highly involved with analyzing WaMu's risk management processes. (¶ 80.) CW 79 alleges that Killinger attended monthly Enterprise Risk Committee meetings where "all aspects of risk across the bank were discussed, including credit, market and operational risk." (¶ 82.) Plaintiffs also allege that the risk parameters for the Company's lending practice could not have been changed without Killinger's consent. (¶ 87 (CW 79

testimony).) In addition, Killinger's own statements about risk management show his detailed knowledge about the processes. These allegations show his actual knowledge of the risk management problems of which Plaintiffs complain. Defendants' efforts to show alternative inferences of innocence do not weigh against the strong inference scienter. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499 ("the court must take into account plausible opposing inferences" of innocence); (Dkt. No. 321 at 24–28.)

### b. *Appraisals*

■ Plaintiffs allege that Killinger knowingly made eight false statements regarding WaMu's appraisal process that deceived investors. (¶¶ 96–103.) Plaintiffs focus on comments that WaMu's LTV ratio was a "key determinant of future performance" and that the LTV ratio had been kept low to "offset[ ] the credit risk associated with negative amortization...." (¶ 96.) Killinger is also alleged to have misled investors by downplaying the concerns about negative amortization and stating that "there's a very strong governance process over those external appraisers." (¶¶ 97–98.)

These statements are alleged to be false because the LTV ratios of which Killinger spoke resulted from a "corrupt appraisal process." (¶ 105.) As a result, the LTV overstated the value of the homes for which WaMu sold loans and permitted WaMu to claim a lower credit risk than was accurate. Plaintiffs detail an "undisclosed appraisal inflation practice" within WaMu in which the Company (1) exerted undue pressure on appraisers to hit target home values, (2) refused to use appraisers who would not capitulate to WaMu's demands to increase appraisal values, and (3) misused the reconsideration on value ("ROVs") method when appraisals did not hit the values WaMu desired. (¶ 105; ¶¶ 106–61.) Plaintiffs provide substantial

detail as to this secret effort, relying on CW testimony from various branch level loan officers and underwriters up to regional managers in WaMu's Appraisal Department. (*Id.*) The breadth and depth of these allegations emphasize the pervasive nature of this purported corruption. *See In re Countrywide Fin. Corp. Derivative Litig.,* 554 F.Supp.2d 1044, 1058–59 (C.D.Cal.2008) (finding a strong inference of scienter based on CW testimony from Countrywide's workforce that detailed "a rampant disregard for underwriting standards"). Plaintiffs have also provided expert data analysis reinforcing their claim that WaMu's appraisal process was corrupt. (¶ 161.) Based on these allegations, the Court finds that the Plaintiffs have sufficiently pleaded the falsity of Killinger's statements.

■ Plaintiffs' appraisal allegations raise a strong inference of scienter. Plaintiffs allege that Killinger, as part of senior management, was aware of demands from eAppraiseIT, an external appraiser that frequently performed work for WaMu, to stop receiving pressure from WaMu to increase appraisal values. (¶ 164.) Plaintiffs rely on the allegations of the New York Attorney General's ("NYAG") complaint and internal WaMu and eAppraiseIT documents to show that Killinger "knew or recklessly disregarded WaMu's widespread and blatant appraisal manipulation." (¶ 164.) Plaintiffs also highlight the importance of accurate LTV ratios and appraisals to WaMu's credibility as a source of scienter. Lastly, they point to Killinger's role in overseeing the appraisal process and his statements that show his knowledge of the appraisal process. (¶¶ 167–68.) These allegations raise a strong inference of scienter, bridging the gap between information available to Killinger to his actual knowledge. *See South Ferry,* 542 F.3d at 783. Defendants have

not raised a more compelling inference of innocence. (Dkt. No. 321 at 24–28.)

### c. *Underwriting*

■ Plaintiffs allege that Killinger made twenty false and misleading statements about WaMu's underwriting standards that misled investors throughout the Class Period. (¶¶ 169–89.) Plaintiffs highlight Killinger's statements that WaMu was "disciplined and vigilant in [its] underwriting standards," (¶ 170), had "excellent processes, policies, underwritings, standards," (¶ 171), and that WaMu "seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans" (¶ 174). Plaintiffs allege as false Killinger's statement in October 2006 that "[w]e have more than 20 years experience underwriting and originating option ARM loans through many market cycles [and] the quality of our option ARM portfolio remains strong." (¶ 178; *see* ¶ 180 (same).) Plaintiffs also allege as false Killinger's statement that "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards ...." (¶ 184; *see* ¶ 185.) Similarly, Plaintiffs allege that Killinger falsely stated that "[i]n our underwriting on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate." (¶ 179.) Killinger is also alleged to have made a false statement that WaMu had anticipated a downturn in the housing market and "tightened underwriting." (¶ 181; *see* ¶¶ 186–88.) Lastly, Plaintiffs allege that Killinger falsely stated that WaMu had maintained a "rigorous[ ] adher[ence] to [its] minimum FICO threshold" in its subprime portfolio. (¶ 183 (alterations in original).)

Plaintiffs establish with particularity that WaMu lowered its underwriting standards and pressured underwriters to approve loans outside of the guidelines. (¶¶ 192–223.) CWs from nearly every level of the Company throughout the country verify that WaMu lowered its underwriting standards and systematically granted exceptions to the guidelines that became virtually nonexistent. (*See* ¶¶ 195, 197, 200, 202–06, 210, 213–14, 216, 225–26, 228–29); *In re Countrywide*, 554 F.Supp.2d at 1059 (finding a similar practice rendered underwriting standards superfluous). Plaintiffs also rely on expert analysis to allege that WaMu had a much higher loan-to-income ratio than its peers, which "confirms that the deterioration in the underwriting standards at WaMu was nationwide in scope and material in its effects." (¶ 238.) Additionally, Plaintiffs allege, with support from CWs, that until late 2007, WaMu underwrote Option ARMs to the teaser-rate, rather than the fully indexed rate. (¶¶ 225–26.) These allegations, taken together, show with particularity, that Killinger's statements and omissions alleged above are false and misleading.

■ However, Plaintiffs may not proceed as Killinger's statement in paragraph 182. Plaintiffs allege as false Killinger's statement that WaMu acted in "prudent manner" with regard to higher-margin mortgage products. (¶ 182.) This allegation is simply too vague to be considered a material misstatement. Defendants' motion is granted as to this statement.

■ Plaintiffs' allegations raise a strong inference of scienter. Killinger's own statements show the extent to which he was deeply familiar with WaMu's underwriting guidelines and had actual knowledge of the falsity of his statements. Additionally, Plaintiffs allege that Killinger had access to regular and special reports on underwriting. (¶ 241.) Citing to CW 65, Plaintiffs also allege that Killinger issued internal email and pre-recorded statements once a quarter detailing the struc-

ture of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume. (¶ 242.) This allegation is substantial, especially when considered in light of CW statements that WaMu senior management, including Killinger, reviewed and approved all changes to the underwriting guidelines and reviewed reports tracking exceptions to the underwriting guidelines. (¶¶ 244–49.) Plaintiffs' allegations show Killinger's knowledge of and access to information contradicting his statements. *See South Ferry*, 542 F.3d at 783. Plaintiffs also point to the allegations of scienter regarding WaMu's risk management as additional support. (¶¶ 76–94, 241.) Defendants have not raised a competing inference of innocence that outweighs the strong inference of scienter. (Dkt. No. 321 at 24–28.)

Killinger argues that the Complaint is inconsistent as a matter of logic because WaMu could not have had lax underwriting standards and also allowed major exceptions to them. (Dkt. No. 321 at 16.) This argument is unavailing. The court in *In re Countrywide* addressed this same point and found that Plaintiffs "paint[ed] a compelling portrait of a dramatic loosening of underwriting standards" where "significant deviations in underwriting were permitted . . . ." 554 F.Supp.2d at 1058. Here, Plaintiffs have alleged that WaMu both loosened the guidelines and allowed exceptions to them. The two are not logically dissonant; they operate in tandem.

#### d. *Financial statements and internal controls*

■ Plaintiffs allege that Killinger made false statements and omissions about WaMu's financial statements and internal controls, and certified SEC filings containing similar false statements throughout the Class Period. (¶¶ 267–90.)

Plaintiffs allege that on October 19, 2009, the start of the Class Period, WaMu issued a press release containing purportedly false statements as to the Company's net income, Allowance, and earnings per share that Killinger failed to correct. (¶ 267.) Killinger is alleged to have made related omissions in similar press releases throughout the Class Period. (*See* ¶¶ 271, 274, 177, 280, 283, 286, 288.) Plaintiffs also allege that Killinger did not correct false statements about WaMu's financial statements and internal controls when he certified Quarterly and Annual Reports. (¶¶ 268–69, 272–73, 275, 278, 281, 284–85, 287, 289.) Additionally, Plaintiffs point to affirmative statements Killinger made to investors at various conferences representing that WaMu had sound reserving methodologies. (¶¶ 270, 276, 279, 282.)

The falsity of these statements and omission is alleged in forty-eight paragraphs that detail the applicable accounting guidelines and WaMu's failure to provision the Allowance accurately and in acknowledgement of the risks it created by emphasizing loan volume over quality. (¶¶ 292–324.) Plaintiffs allege that as of September 2005, the LPRM, which helped calculate the Allowance, was untested on negative amortizing loans and that it lacked of calibration during most of the Class Period. (¶¶ 309–22.) By not accounting for negative amortizing loans, which constituted over 50% of WaMu's residential loan portfolio throughout the Class Period, the LPRM could not have calculated the Allowance properly. (¶¶ 192, 310–19.) These allegations add to falsity of Killinger's statements. Plaintiffs also provide expert analysis quantifying, where possible, the amount by which WaMu failed to provision its Allowance. (¶¶ 325–30.) These allegations support Plaintiffs' claim of falsity.

Plaintiffs allege that the remarks regarding WaMu's internal controls were also false because the Company did not have proper management oversight of and

reporting for the Allowance and credit reserves. (¶¶ 332–35.) Plaintiffs rely primarily on the Corporate Risk Oversight ("CRO") Report, an internal WaMu document from September 2005, that highlighted gaps in WaMu's internal controls related to its drive to increase loan volume. (¶¶ 331–33.) According to Plaintiffs, the problems identified were slowly addressed, never fully remediated, and never disclosed to the public. (¶¶ 323, 325.) As a result, Killinger's statements in SEC filings that internal controls were effective were not, as alleged, true. The Court finds these allegations sufficiently establish the falsity of Killinger's statements.

■■■■ Plaintiffs' allegations of motive and opportunity are only marginally probative of scienter. In considering (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency with prior trading, the Court is not convinced a strong inference can be drawn from Killinger's sales. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir.2004). Plaintiffs point out that Killinger's sales during the control period (January 13, 2003 to October 17, 2005) compared to the Class Period show a 226% increase in stock sales (from $4 million up to $13.1 million). (*Id.*) However, Killinger points out that this is merely 5% of his overall WaMu stock holdings. (Dkt. No. 321 at 25.) While Killinger's sales are not particularly consistent, the percentage of shares sold is not disproportionately high—just over 2 times higher than in the control period. This falls below what the Ninth Circuit has considered "unusual." *See Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir.1996) (holding that the sale of shares during the class period of almost six times more stock than in the 12 months prior to the class period was probative of scienter). Similarly, the $13.1 million cannot said to be so high as create an inference of scienter given that Killinger's sales were only 5% of his total

holdings. *See Nursing Home,* 380 F.3d at 1232 (where defendant sold $900 million worth of stock that amounted to just 2.1% of his total holdings, a finding of motive existed despite the low percentage). As to timing, Plaintiffs have not pointed to any particularly critical periods that raise an inference of scienter. However, that Plaintiffs' motive allegations do not raise a strong inference of scienter is not fatal to their claim. *See Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499; *Fouad v. Isilon Sys., Inc.,* No. C07–1764–MJP, 2008 WL 5412397, at *11 (W.D.Wash. Dec. 29, 2008).

Plaintiffs' allegations regarding financial statements and internal controls raise a strong inference of scienter. Plaintiffs allege that Killinger attended monthly Risk Management Committee meetings and received financial forecasts or projections from WaMu's different business units. (¶ 338.) Plaintiffs allege that Killinger spoke of the importance of the Allowance to WaMu's earnings and that there were ample red flags throughout the Class Period that the Allowance was under-provisioned. (¶¶ 340–43.) Killinger was also required to ensure that the process for calculating the Allowance was proper, and that the allowance would "represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision." (¶ 341.) Killinger is also alleged to have received the CRO Report, which gave him actual knowledge of the deficiencies in WaMu's internal controls. (¶ 339); *see South Ferry,* 542 F.3d at 783. The scienter allegations against Killinger as to risk management, appraisals, and underwriting also support Plaintiffs' claim. (¶¶ 75–94, 162–68, 240–65.) Defendants have failed to present any persuasive, competing inferences of innocence. (Dkt. No. 321 at 24–28.)

### 2. *Thomas Casey*

Defendant Thomas Casey was the Executive Vice President and CFO of WaMu from October 2002 through October 11, 2008. (¶ 22.) He also served on the Executive Committee, overseeing the Company's corporate finance, strategic planning, and investor relations. (*Id.*)

#### a. *Risk management*

██ Plaintiffs allege that Casey made four false and misleading statements and signed two SEC filings that contained misstatements about WaMu's risk management. (¶¶ 357–64.) Casey stated on October 19, 2005 that "[w]e continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure." (¶ 358.) Casey made nearly identical statements on January 18, 2006, April 18, 2006, and April 17, 2007. (¶¶ 360–61, 363.) Casey also signed a Quarterly Report on November 7, 2005, that, as discussed above, is alleged to have contained false statements regarding the efficacy of WaMu's ERM. (*Compare* ¶ 359 *to* ¶ 47.) Plaintiffs present no new allegations of falsity, relying instead on the allegations addresses above as to Killinger. The Court's decision as to those allegations applies to Casey's statements regarding risk management.

██ Plaintiffs' allegations raise a strong inference of scienter. First, Casey is alleged to have made public claims as to his knowledge of the risk management function of the Company and his close oversight thereof. (¶ 372.) Second, Plaintiffs allege that throughout the Class Period Casey received weekly Risk Reports that "specifically quantified the fact that he Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines." (¶ 367.) Similarly, Plaintiffs allege Casey attended monthly Risk Management Meetings where "all aspects of risk across the bank were discussed, including credit, market, and operational

risk." (¶ 371.) Third, Plaintiffs allege that CW 80, a Senior Vice President for Accounting Policy from June 2006 until November 2007 told Casey directly that WaMu's "risk management and accounting standards had dangerously deteriorated, with material effects on the Company's financial statements." (¶¶ 368–70.) Plaintiffs also point to CW 80's statement that "Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed." (¶ 370.) Defendants' have not offered a persuasive basis on which to infer an innocent intent. (Dkt. No. 316 at 9–16.)

#### b. *Appraisals*

██ Plaintiffs allege that Casey made two false statements and certified two Annual Reports filed with the SEC that contained false statements about the Company's appraisal inflation. (¶¶ 375–80.) On October 19, 2005, Casey told investors that only 8% of the Option ARM portfolio had an LTV ratio in excess of 80% and that only 2% had an LTV above 90% at origination. (¶ 376.) Casey also stated on July 18, 2007 that despite forecasting higher nonperforming assets in home loans, "we expect losses to be much lower due to the lower LTVs and high FICO profile of our prime portfolio." (¶ 379.) These statements, Plaintiffs allege, were false because the appraisal process had been secretly corrupted and that the LTV ratios were inaccurate and understated. (¶¶ 105–61.) These allegations plead with particularity the falsity of Casey's statements. Similarly, the financial statements Casey signed are sufficiently alleged to be false, for the reasons set out above in Section I.A. 1.b.

██ Plaintiffs' allegations raise a strong inference of scienter. Casey, as part of senior management, is alleged to have known or "recklessly disregarded WaMu's blatant appraisal interference."

(¶ 384.) Given the importance of the LTV and appraisal valuation and Casey's position within the Company, he is alleged to have known of the secret appraisal manipulation. Casey is also alleged to have been aware of the complaints from eAppraiseIT, giving him actual knowledge of the appraisal manipulation. (¶ 384.) Similarly, Casey is alleged to have known of the appraisal inflation given the federal regulations requiring him to ensure a proper appraisal process and access to information to satisfy this duty. *See South Ferry*, 542 F.3d at 785 (holding that when combined with allegations that the defendant was exposed to specific factual information, allegations of "management's role in the corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter"). These allegations are sufficient to raise a strong inference of scienter, and Defendants fail to provide a persuasive basis on which to infer an innocent intent. (Dkt. No. 316 at 9–16.)

### c. *Underwriting*

■ Plaintiffs allege that Casey made four false statements and signed one Annual Report containing misstatements about the Company's underwriting. (¶¶ 389–95.) On April 18, 2006, Casey stated that "[c]redit quality continues to surpass our expectations ... [and that] [g]iven the good credit quality and provision level of this quarter, we are revising our credit provision outlook downward to $650 to $750 million." (¶ 390.) On that same day, Casey stated at the annual shareholders meeting that "[o]ur credit provision was below our original expectation, reflecting our disciplined credit underwriting and a favorable credit environment." (¶ 391.) On July 19, 2006 Casey praised the "strong ongoing stability and strength of the [loan] portfolio" and stated that the "[c]redit quality continues to be

strong." (¶ 393). Casey also stated on April 17, 2007 that WaMu was "being selective with [its] underwriting" with regard to subprime loans and that the Company had "significantly increased [its] pricing and decreased [its] risk profile that [it was] willing to underwrite to...." (¶ 394.) The falsity of these statements is explained above in Section I.A.1.c, *supra.*

■ Plaintiffs again raise a strong inference of scienter. Given Casey's position within the Company and the statements Casey made with apparent knowledge of WaMu's underwriting guidelines, he appears to have had knowledge of the true state of WaMu's underwriting process. (¶ 397.) Plaintiffs add further detail, alleging that Defendant Schneider could not have adjusted the underwriting guidelines without Casey's knowledge. (¶ 398 (relying on CW 79's statements).) Plaintiffs also allege that Casey was aware of WaMu's underwriting given its critical importance to WaMu's financial health and given the regimented process that governed the guidelines. (¶¶ 399–400.) *See In re Countrywide*, 554 F.Supp.2d at 1063–64 (a defendant's oversight duty, combined with the magnitude of the lending practice may add to an inference of scienter). Defendants fail to raise a negative inference of innocence sufficient to overcome these substantial allegations. (Dkt. No. 316 at 9–16.)

### d. *Financial statements and internal controls*

■ Plaintiffs allege that Casey made five false and misleading statements about WaMu's financial condition and signed both certifications and SEC filings containing misstatements regarding WaMu's financial condition and internal controls. (¶¶ 402–15.) For example, Casey stated on October 18, 2006 that "[w]e do reviews

of our provision throughout the year and our [Allowance] every single quarter and this quarter was no different from any other quarter." (¶ 408.) Casey continued, stating that "[w]e continue to look at all of our loss factors and the performance of [the] underlying portfolio and continually make adjustments." (*Id.*) Casey made even more detailed comments about WaMu's methods of provisioning for loan losses and assured investors WaMu was being "very disciplined." (¶¶ 411, 413–13.) The falsity of these statements is explained above in Section I.A. 1.d, *supra.*

■■■ Again, Plaintiffs raise a strong inference of scienter. Plaintiffs allege that as CFO, Casey was responsible for the Company's financial reporting and that his statements show his detailed knowledge of WaMu's financial condition. (¶ 419.) Plaintiffs cite testimony from CW 79 and CW 80 that Casey was directly informed of problems with risk management and that Casey attended monthly Risk Management Committee meetings where financial forecasts were discussed. (¶¶ 420–21.) Plaintiffs also allege that the CRO Report was circulated to Casey, which gave him actual knowledge of WaMu's internal control deficiencies. (¶ 422.) These allegations alone sufficiently raise a strong inference of scienter. Plaintiffs also rely on the materiality of the accurate financial reporting to sustain their claim. Plaintiffs' allege that Casey had motive and opportunity to make false statements given that his bonuses were tied to the Company's performance. *See Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499 (noting that personal financial gain may weigh heavily in favor of an inference of scienter). These allegations are probative of scienter. Defendants' arguments as to motive, while persuasive, are not sufficient to outweigh the many other allegations supporting the strong inference. (Dkt. No. 316 at 10–11.) Moreover, the Court is not persuaded by Defendants' attack on Plaintiffs' CWs, whose allegations are broad, detailed, and probative of scienter. (*Id.* at 13–16); *see In re Countrywide,* 554 F.Supp.2d at 1058–59 (finding a similar use of CWs from throughout the Company probative of scienter).

### 3. *Stephen Rotella*

Stephen Rotella served as WaMu's President and Chief Operating Officer from January of 2005 until he resigned on October 3, 2008. (¶ 23.)

#### a. *Risk management*

■■■ Plaintiffs allege that Rotella made five misleading and false statements about WaMu's risk management. On January 31, 2006, Rotella stated that the Company felt "pretty good" as to "credit" generally and that he felt "pretty good about the credit risk" in the balance sheet of Option ARM products. (¶ 429.) Rotella then stated on May 9, 2006 that although the Company had seen a slowing in the housing market there was "little evidence of any real deterioration in the consumer," and that WaMu's ERM was monitoring this closely. (¶ 430.) At the Investor Day conference in September 2006, Rotella stated that he and the Officer Defendants felt "good about the fact that we've been aggressive in controlling what we can control. Frankly we've been ahead of the market in my perspective." (¶ 431.) On the investor call of April 17, 2007, Rotella stated that " . . . since the beginning of last year [we have] been tightening credit in that part of the business," referring to subprime lending. (¶ 431.) On that same day, at the annual shareholders meeting, Rotella stated that the Company was "tighten[ing] credit" in the subprime sector. (¶ 433.) The falsity of these statements is laid out in paragraphs 62–74 of the Complaint, which shows that Rotella's statements were false and misleading. *See* Section I.A. 1.a, *supra.*

■ Plaintiffs' allegations raise a strong inference of scienter. Rotella is alleged to be the person who spearheaded the restructuring of credit risk reporting and that "Rotella was charged with managing both loan production and risk management in his role as WaMu' President and COO." (¶ 70.) As reported by the Seattle Times, Rotella was responsible for halting efforts to tighten lending standards within the credit risk department. (¶ 440.) These allegations raise a strong inference of scienter. See Daou, 411 F.3d at 1023 (allegations of direct involvement in the allegedly improper activities may create a strong inference of scienter). Plaintiffs allege further that Rotella received weekly "Risk Reports" that quantified the ways in which the Company was exceeding risk parameters that WaMu itself dictated. (¶ 441.) These allegations support the claim that Rotella knew he was making false and misleading statements to the investing public. Defendants have not articulated sufficient reasons that an inference of innocence outweighs these allegations. (Dkt. No. 316 at 9–16.)

### b. *Appraisals*

■ Rotella is alleged to have made only one false statement regarding appraisals. On May 9, 2006, Rotella stated that the Company's low LTV ratios were a "protection against losses going forward." (¶ 445.) Plaintiffs also allege that Rotella failed to correct false statements made in his presence. (¶ 446.) The falsity of Rotella's statement is explained above, in that WaMu's LTV ratios were inaccurately understated and therefore not a source of protection against losses. The strong inference of scienter comes from Rotella's position as COO (¶ 23), the importance of LTV and appraisals to the Company (¶ 449), his duty to enforce an independent appraisal system (¶ 385), his alleged awareness of the complaints about a corrupt appraisal process from eAppraiseIT

(¶ 384), and the statements he made detailing particulars of the LTV and appraisal process (*see, e.g.,* Dkt. No. 316 at 20). Taken together, these allegations raise a strong inference of scienter. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499. Competing inferences of an innocent intent are not convincingly made and do not weigh against the strong inference of scienter. (Dkt. No. 316 at 9–16.)

### c. *Underwriting*

■ Plaintiffs charge Rotella with making four false statements regarding WaMu's underwriting standards. On January 18, 2006, Rotella stated that as to Option ARMs, "an important fact is that we underwrite every loan at the fully indexed rate. And so that's an important thing to note from a credit perspective." (¶ 451.) Plaintiffs allege as false Rotella's statement on January 31, 2006 that the Company had mitigated exposure to exotic loans by doing a "good job of trying to fit the right customer to that mortgage" and that "[t]he credit quality on those products has been quite good." (¶ 452.) Plaintiffs also allege as false Rotella's statement on May, 2006 that non-performing assets were at a "terrific" level and the Company was "prudent in [its] credit extension . . . ." (¶ 453.) Again on July 19, 2006, Rotella downplayed the degradation of the subprime portfolio, stating that "we're being quite careful and making any changes we need to make in our credit policies as we move forward, but our sense of things are—things are in pretty good shape." (¶ 454.) These statements, Plaintiffs allege, hid from investors the truth of regarding several of WaMu's underwriting practices. Plaintiffs have alleged sufficient facts that show that WaMu did not underwrite Option ARMs to the fully-indexed rate or maintain adequate underwriting guidelines. *See* Section I.A.1.c, *supra.*

The falsity of Rotella's statements is adequately alleged.

■ Plaintiffs' allegations raise a strong inference of scienter. Plaintiffs allege that changes in underwriting could not have been made without Rotella's knowledge. (¶ 458.) Moreover, Rotella is alleged to have issued internal emails and pre-recorded statements once per quarter detailing the structure and changes of WaMu's guidelines. (¶ 460.) Rotella's position and statements also show his knowledge of WaMu's underwriting standards, which add to an inference scienter. (¶ 458.) Defendants' arguments in favor of an innocent intent are not persuasive when considered against Plaintiffs' allegations. (Dkt. No. 316 at 9–16.)

### d. *Financial results*

■ Plaintiffs allege that Rotella failed to correct statements of Killinger, Casey, and Schneider as to WaMu's financial state, despite his knowledge to the contrary. (¶ 463.) The falsity of these allegations is sufficiently pleaded, as discussed above. *See* Sections I.A. 1.d. Plaintiffs have raised a strong inference of Rotella's scienter. They point to his attendance of monthly Risk Management Committee meetings, access to the CRO Report which was circulated to him, and the materiality of the Allowance to the Company's overall reputation and stability. (¶¶ 466–69.) Plaintiffs allege further that Rotella had motive and opportunity not to correct these statements because he was given bonuses based on the Company's overall performance. (¶ 470.) While this alone is insufficient to show scienter, it adds to the totality of the allegations which are sufficient to survive dismissal, notwithstanding Defendants' arguments to the contrary. *See Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499; (Dkt. No. 316 at 9–16.)

### 4. *Ronald Cathcart*

Ronald Cathcart served as Executive Vice President and Chief Enterprise Risk Officer at WaMu from December 2005 to April 2008. (¶ 24.)

### a. *Risk management*

■ Plaintiffs allege that Cathcart made one false statement regarding WaMu's risk management. On September 6 or 7, 2006, he stated that "we have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in." (¶ 473.) The falsity is explained above and applies with equal force here. *See* Section I.A. 1.a, *supra*. Plaintiffs raise a strong inference of scienter based on Cathcart's role as head of Enterprise Risk, where his chief responsibility was overseeing risk management. (¶ 476.) He is alleged to have attended monthly meetings with the other Officer Defendants where he discussed WaMu's risk exposure in detail. (¶ 477.) These allegations, considered against the backdrop of inferences of innocence, raise a strong inference of scienter. *See South Ferry*, 542 F.3d at 783; (Dkt. No. 316 at 9–16.)

### b. *Appraisals*

■ Plaintiffs allege only that Cathcart failed to correct Killinger's statement on September 6 or 7, 2006 that there was a "very strong governance process over those external appraisers." (¶ 98, 488.) The falsity of this allegation is explained above. As to scienter, Plaintiffs point to the same allegations made as to Casey. (¶¶ 383–86, 490.) These raise a strong inference of scienter as to Cathcart. Defendants have not persuaded the Court that an innocent intent outweighs Cathcart's scienter. (Dkt. No. 316 at 9–16.)

### c. *Underwriting*

■■■ Plaintiffs allege that on September 6 or 7, 2006, Cathcart falsely stated that "[a]t origination, WaMu focuses on an effective underwriting process and borrower disclosures," that "WaMu controls the underwriting so we have the opportunity to evaluate the borrower at the time of origination" and that "overall we are comfortable with this portfolio." (¶ 492.) As discussed above, this statement is false in light of Plaintiffs' allegation that WaMu's underwriting guidelines were secretly lowered and largely disregarded. Scienter is alleged based on Cathcart's position in the Company, his role in auditing the Company's underwriting guidelines as to risk, and the importance of residential lending to the Company. (¶¶ 495–98.) Plaintiffs also allege that he had motive to perpetrate this fraud given the substantial bonuses he received for WaMu's continued high performance. (¶ 499.) These allegations raise a strong inference of scienter, despite Defendants' efforts to show a negative inference of innocence. *See Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499; (Dkt. No. 316 at 9–16.)

### 5. *David Schneider*

David Schneider served as the Executive Vice President and President of Home Loans from August 2005 until late 2008. (¶ 25.) He was responsible for overseeing all aspects of the home lending operations. (*Id.*)

### a. *Risk management*

■■■ Plaintiffs allege that Schneider falsely stated on November 15, 2005, that "we've maintained effective risk management processes. This is clearly a top priority for us. We've invested a significant amount in terms of talent and technology in building risk management." (¶ 502.) The falsity of this statement is supported by the allegations that risk management became superfluous and substantially undermined throughout the Class Period. *See* Section I.A. 1.a, *supra*. Plaintiffs allege scienter based on the allegations from CW 19 that Schneider held weekly meetings where he received reports on all compliance and credit risk deficiencies. (¶ 507.) CW 78 also states that Schneider received the monthly "Credit Risk Review" which detailed WaMu's risk exposure. (¶ 508.) These allegations raise strong inference of scienter, outweighing competing innocent inferences. (Dkt. No. 316 at 9–16.)

### b. *Underwriting*

■■■ Plaintiffs allege that Schneider's statement on November 15, 2005 that "[w]e've done a few things to improve our margins [for Option ARM loans]" and that "[t]hose [changes,] combined with some tightening of underwriting guidelines primarily around the investor property will ensure that we can generate higher margins and receive the required returns on the product." (¶ 513.) This is allegedly false because the underwriting guidelines were instead loosened and disregarded, as explained *supra*. These allegations sufficiently show the falsity of Schneider's statements. Plaintiffs allege Schneider was aware of the lax guidelines because he was head of Long Beach Mortgage ("LBM"), the major subprime lending arm of WaMu, where he oversaw the underwriting process in detail. (¶ 519.) During the Class Period, Schneider is alleged to have known details of LBM and therefore WaMu's true underwriting standards. (¶ 519 (citing CW testimony).) Plaintiffs also point to CW 79, who states that Schneider was responsible for adjusting WaMu's lending practices "as they related to risk," including underwriting. (¶ 518.) These allegations raise a strong inference of scienter that competing inferences of innocence do not outweigh. (Dkt. No. 316 at 9–16.)

### c. Financial results and internal controls

 Plaintiffs allege that Schneider made a false statement to investors on November 15, 2005 that "[o]n subprime, we have seen, as other have seen, some early payment default and repurchase activity. We saw most of that occur for us in late '05 Q4 '05 and first quarter of '06. We reserved for it appropriately." (¶ 524.) This statement is sufficiently alleged to be false given that the WaMu allegedly did not properly reserve for such losses in late 2005, as discussed *supra.* Plaintiffs allege Schneider's scienter based on his access to the CRO Report, the monthly Risk Management Committee meetings where he gained actual knowledge of the Allowance, the materiality of the Allowance, and his motive and opportunity. (¶¶ 527–32.); *see South Ferry,* 542 F.3d at 783. Under the holistic analysis of *Tellabs,* the Court finds that Plaintiffs create a strong inference of scienter, notwithstanding Defendants' contrary arguments. (Dkt. No. 316 at 9–16.)

### B. Counts Two and Three: Section 20(a) of the Exchange Act

In Count Two, Plaintiffs assert claims against the Officer Defendants and Defendants Woods and Ballenger for violations of § 20(a) of the Exchange Act. In Count Three, Plaintiffs assert similar claims against the Outside Director Defendants.

The Court previously found that Plaintiffs had sufficiently stated claims against Defendants Killinger, Casey, Woods, and Ballenger, and the Outside Officer Defendants for control person liability under of § 15 if the Securities Act. (Dkt. No. 277 at 30–32.) Because the control person analysis does not differ between § 15 of the Securities Act and § 20 of the Exchange Act, the Court's prior Order applies with equal force to the § 20 claims against these defendants. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1578 (9th Cir.

1990). Count Two and Three are adequately pleaded. The Outside Directors' and Defendants Woods and Ballenger's motions are DENIED as to all statements that remain actionable as described *supra.* Killinger, Casey, Rotella, Cathcart, and Schneider do not challenge their status as control persons, and all of Plaintiffs' § 20 claims against them survive dismissal.

## II. PLAINTIFFS' SECURITIES ACT CLAIMS

### A. Count Four: Section 11 of the Securities Act

The Court previously found that Plaintiffs had successfully stated a claim against Defendants Killinger and Woods, the Outside Director Defendants, Deloitte, and the Underwriter Defendants for violations of § 11 of the Securities Act as to the October 2007 securities offering. (Dkt. No. 277 at 23–29.) The Court also found that Plaintiffs lacked standing to assert claims under §§ 11 and 12(a)(2) of the Securities Act for the August 2006, September 2006, and December 2007 securities offerings. Plaintiffs have named three new plaintiffs in order to correct these deficiencies. Plaintiffs are only partly successful, as explained below.

#### 1. Pleading standard

The previously set forth the proper standard governing Plaintiffs' Securities Act claims. (Dkt. No. 277 at 20–22.)

#### 2. Standing under section 11

 Under § 11, a person acquiring a security pursuant to a registration statement containing a false or misleading statement has standing to sue a variety of participants in the security's issuance. 15 U.S.C. § 77k(a) (emphasis added). Though initial and aftermarket buyers alike have standing, aftermarket buyers face the additional task of tracing their

purchase to the registration statement. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 n. 4 (9th Cir.1999). If a purchaser acquires the security after the issuer made available an earnings statement covering a twelve-month period after the effective date of the registration statement, he must show reliance. 15 U.S.C. § 77k(a). This may be done "without proof of the reading of the registration statement...." *Id.*

Defendants contend that the newly named plaintiff, Pompano Beach Firefighters' Retirement System ("Pompano") lacks standing to represent a class of purchasers of 5.50% Notes issued in the August 2006 offering. (Dkt. No. 310 at 10–11.) Pompano did not purchase the 5.50% Notes. Rather, it purchased Floating Rate Notes that were issued in the same offering. (¶ 279.) Plaintiffs do not have standing to pursue § 11 claims as to the 5.50% Notes. There is no named plaintiff who can be deemed a "person acquiring such security" (the 5.50% Notes) as required by § 11(a), and, thus, no named plaintiff has suffered an "actual injury." *See Casey v. Lewis*, 4 F.3d 1516, 1519 (9th Cir.1993). Plaintiffs' § 11 and § 12(a)(2) claims as to the 5.50% Notes are DISMISSED. However, Defendants do not move to dismiss Plaintiffs § 11 claims as to the Floating Rate Notes, for which Plaintiffs have standing.

■ Defendants argue that Harlan Seymour, a newly named plaintiff who purchased Series K stock issued in the September 2006 offering on July 15, 2008, lacks standing. The parties agree that Seymour must allege reliance, but dispute the sufficiency of the pleadings. Plaintiffs allege that all named plaintiffs, including Seymour, "acquired these securities relying upon the statements ... shown above to be untrue and/or relying upon the Registration Statements ... and not knowing the omitted material facts...." (¶ 841.) Plaintiffs also allege that "Class members

did not know, or in the exercise of reasonable diligence could have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts...." (¶ 846.) These allegations are sufficient under Rule 9 to allege reliance, particularly given § 11's express statement that reliance may established "without proof of the reading of the registration statement...." 15 U.S.C. § 77k(a).

Defendants also move to dismiss Plaintiffs' § 11 claims as to the December 2007 offering of Series R Preferred Stock on the basis that the named plaintiff who purchased this stock, Police & Fire Retirement System of the City of Detroit ("Detroit P & F"), was an "in-and-out" trader. (Dkt. No. 310 at 16–17.) This is a question of loss causation, not one of standing. Plaintiffs have standing to pursue claims as to this offering, given that Detroit P & F's purchased the Series R Preferred Stock the same day it was first offered. (¶ 677; *id.* at 287.)

Plaintiffs therefore have standing under § 11 to pursue claims regarding those securities the named plaintiffs purchased in the August 2006, September 2006, and December 2007 offerings.

### 3. *Substantive section 11 allegations*

Plaintiffs allege that the offering documents for the August 2006, September 2006, and December 2007 securities offerings contain untrue statements and omissions of material fact regarding WaMu's lending practices, financial results, and internal controls. (¶¶ 831; 769–830.) The Court previously found that the allegations as to the October 2007 offering were sufficiently pleaded with particularity to survive dismissal. (Dkt. No. 277 at 23–29.) Deloitte now challenges the sufficiency of the allegations as to the three new offerings regarding financial statements and

internal controls. (Dkt. No. 313 at 11–18, 22–23.) The Underwriter Defendants attack the claims on the basis of negative causation. (Dkt. No. 17–25.) Defendants do not contest the sufficiency of the allegations as to the residential lending practices and the Court does not address them.

#### a. *2006 offerings: financial statements*

■ Plaintiffs allege that the 2006 offering documents contain "materially misstated financial returns for WaMu for 2005 and the first half of 2006." (¶ 773.) Plaintiffs focus particularly on the Company's Allowance, which they claim was materially understated, causing WaMu's net income and earnings per share to be materially overstated. (*Id.*) The Court previously found these allegations with regard to the October 2007 offering documents pleaded with sufficient particularity to withstand dismissal. (Dkt. No. 277 at 27–28.) Under GAAP and SEC guidelines, WaMu was required to increase its Allowance commensurate with the Company's credit risk. (¶ 749.) Plaintiffs allege that the financial statements incorporated in the 2006 offering documents falsely presented an Allowance that should have been higher because: (1) the LPRM did not account for losses related to Option ARM loans, (2) the Company did not account for its vanishing underwriting standards, and (3) WaMu failed to report the misrepresented LTV ratios on its loans due to appraisal manipulation. (¶¶ 777–78.) Plaintiffs' allegations sufficiently demonstrate with particularity that WaMu's financial statements materially misrepresented the Company's true financial condition, as the Court similarly finds *supra.*

Deloitte argues that Plaintiffs have pleaded themselves out of Court by failing to explain the amount by which the Allowance was understated. (Dkt. No. 313 at 12–13.) Plaintiffs are not required to quantify the amount by which the Allowance was understated. Under Rule 9(b), Plaintiffs are required only to "allege enough information so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Daou,* 411 F.3d at 1017 (quoting *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000)). The alleged violations are widespread and material. Additionally, Plaintiffs have explained that it is not possible to state the precise amount by which the Allowance was understated in 2005 given the occurrence of one-time events, such as Hurricane Katrina. (¶ 327.)

Deloitte argues further that Plaintiffs' allegations regarding the Allowance fail because nothing shows that the LPRM lacked calibration in 2005. (Dkt. No. 313 at 14.) On this point, Deloitte is correct. Plaintiffs allege that "as of the summer of 2007, the LPRM had not been calibrated to reflect actual loan performance data for over eighteen months." (¶ 722.) However, this is not the only allegation regarding the deficiency of the LPRM. Plaintiffs allege that separately from the issue of calibration, the LPRM "did not account for deteriorating loan performance during the Class Period" and that the "the LPRM did not appropriately analyze for risk of losses in the Company's Option ARM loans, or other loans with the potential for 'negative amortization.'" (¶ 751; ¶ 721.) In addition, Plaintiffs allege that Option ARM loans accounted for more than 50% of WaMu's prime single-family residential portfolio throughout the Class Period. (¶ 192 Chart 1.) Thus, regardless of calibration, the LPRM's failure to account for Option ARM loans supports Plaintiffs' claim as to the Allowance's deficiencies. (*Id.*) Defendants' motion is DENIED as to this claim.

### b. *2006 offerings: internal controls*

 Plaintiffs allege that the 2006 offering documents contain false or misleading statements as to WaMu's internal controls. The Court previously found substantially similar allegations sufficient. (Dkt. No. 277 at 25–26.) As to 2006, Plaintiffs allege that throughout the Class Period "the Company falsely represented that WaMu maintained effective internal controls over financial reporting." (¶ 785.) Plaintiffs allege that "the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting and appraisal standards" and that it was "without policies and appropriate methodology in place to ensure the soundness of its valuation of the assets and its Allowance...." (¶ 786.) The CRO Report from late 2005 supports this allegation. As explained in greater detail in Section I.A.1.d, Plaintiffs have sufficiently alleged with particularity why the internal controls statements in the 2006 offering documents were false and misleading.

### c. *December 2007 offering*

The December 2007 offering documents incorporate nearly identical documents and statements as those incorporated into the October 2007 offering that the Court previously found actionable under § 11. (*Compare* ¶ 790 *to* ¶ 816 *and* Dkt. No. 277 at 24–28.) Defendants provide no basis to conclude that Plaintiffs have inadequately pleaded a § 11 claim, and their motion is DENIED.

### 4. *Subjective Falsity*

 Deloitte argues that Plaintiffs must plead that the statements Deloitte made in connection to the 2006 and 2007 offering documents were both objectively and subjectively false. Deloitte relies on *Rubke v. Capitol Bancorp Ltd.*, in which the Ninth Circuit held that fairness opinion from auditors must be plead to be objectively and subjectively false in order to be actionable under § 11. 551 F.3d 1156, 1162 (9th Cir.2009). Plaintiffs' claims against Deloitte, however, turn not on statements of opinion, but statements of fact. Thus, *Rubke*'s subjective falsity standard does not apply to the factual statements Plaintiffs allege.

In *Rubke*, the court addressed whether a plaintiff had to prove the subjective falsity of an auditor's fairness opinion regarding an exchange offer—that a particular offer was "financially fair." *Id.* The court expressly delineated that it was not addressing factual statements, which the parties conceded: "these fairness determinations are alleged to be misleading opinions, not statements of fact...." *Id. Rubke* cites with approval *In re McKesson*, 126 F.Supp.2d 1248, a case which highlights the limits of the subjective falsity standard. In *McKesson*, the court considered an auditor statement that a merger exchange rate was "fair, from a financial point of view." 126 F.Supp.2d at 1264. In applying the subjective falsity standard, the court noted that it did not apply to factual statements: "[o]f course, any purely factual assertions in the fairness opinion, such as Bear Stearns' statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard." *Id.* at 1265–66. As the *McKesson* court put it, "[a] fairness 'opinion' is just that-an opinion." *Id.* at 1265.

The statements examined by courts applying the subjective falsity standard highlight the distinction between opinion and fact statements. For example, the actionable statement in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), relied on by *Rubke*, was one of opinion: a fairness opinion stating that a merger would "achieve a high value." Similarly, this

Court applied the *Rubke* standard to an opinion statement from the defendant that it "hosted a good inspection" by the FDA. *McGuire v. Dendreon Corp.*, 688 F.Supp.2d 1239, 1241 (W.D.Wash.2009). These opinion statements are unlike the factual ones alleged by Plaintiffs against Deloitte. The court's decision in *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, is instructive on the division between factual and opinion statements. 381 F.Supp.2d 192 (S.D.N.Y.2004). There, the plaintiffs alleged that the auditor's certification of a financial statement and fairness opinion contained false and misleading statements. *Id.* at 241, 243. The court concluded that the subjective falsity standard applied to the fairness opinion, but not to the certification. *Id.* This holding is persuasive.

Here, Plaintiffs allege that Deloitte made the misleading and false statement that its internal control reports were audited "in accordance with the PCAOB's standards." (¶¶ 788, 830). Whether or not Deloitte employed the PCAOB standards is a verifiable factual statement that is material to those relying on its certification of WaMu's internal controls. Similarly, Plaintiffs' allegations regarding Deloitte's certification of the financial statements are not subject to the *Rubke* standard. Deloitte's affirmation that the financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" is an actionable statement of fact. (*See, e.g.*, ¶¶ 779, 781.) And as Plaintiffs have set forth, this was false because the financial statements were not prepared in conformity with GAAP, given the improper understatement of the Allowance. (¶¶ 773, 777.) The Court rejects Deloitte's argument that Plaintiffs must plead the subjective falsity of these statements and DENIES the motion on this issue.

### 5. *Negative causation*

The Underwriter Defendants argue that they have shown that negative causation exists on the face of the Complaint as to Plaintiffs Seymour and Detroit P & F. (Dkt. No. 310 at 19–23.) The Court disagrees.

To sustain a securities fraud claim, Plaintiff must allege that the misrepresentations were the proximate cause of the losses suffered. *Dura Pharm.*, 544 U.S. at 344, 125 S.Ct. 1627. "[T]he complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063. Revelation of the fraud need not be complete for loss causation to be adequately pled. (*See* Dkt. No. 277 at 28); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C.2006) ("[R]eading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."). In raising the affirmative defense of "negative causation," the defendant must show that on the face of the complaint, the alleged misrepresentation could not have caused a plaintiff's damages. *See* 15 U.S.C. § 77k(e).

The Underwriter Defendants contend that loss causation is not adequately plead as to Detroit P & F because it was an "in-and-out" trader, who sold its WaMu securities prior to any revelation of fraud. The Court previously found that Plaintiffs alleged "that a series of public disclosures, beginning in October of 2007 and continuing until July 2008, gradually and incrementally revealed previously undisclosed facts about WaMu's true financial condition." (Dkt. No. 277 at 28.) Plaintiffs allege that after Detroit P & F purchased WaMu Preferred stock, a *Wall Street Journal* article revealed that the SEC had launched an investigation into WaMu's

mortgage lending practices. (¶ 586.) This news is alleged to have caused WaMu's stock to decline. (*Id.*) Plaintiffs therefore properly allege loss causation.

The Complaint adequately pleads loss causation with regard to Plaintiff Seymour and the September 2006 offering. Plaintiff Seymour purchased his shares on July 15, 2008, four days before WaMu allegedly "shocked the market" on July 22, 2008, when it announced a net loss of $3.3 billion—more than double the Company's First Quarter 2008 net loss. (¶ 617.) WaMu's stock fell 20% from July 22 to July 23, 2008. The Complaint alleges further that WaMu's true financial condition continued to be revealed to the public after July 23, 2008, up until WaMu was seized by the federal government. (¶¶ 624–26.) This adequately alleges loss causation as to Plaintiff Seymour and the September 2006 offering. The Court rejects Defendants' negative causation argument.

### B. *Count V: Section 12(a)(2) Claims*

 Plaintiffs assert claims pursuant to § 12(a)(2) of the Securities Act against WaMu and the Underwriter Defendants on behalf of the three newly-named plaintiffs with regard to the August 2006, September 2006, and December 2007 securities offerings. The Underwriter Defendants challenge Plaintiffs' standing as to all three offerings. Plaintiffs lack standing to pursue § 12(a)(2) claims as to both 2006 offerings.[5]

Standing under § 12(a)(2) is more restrictive than under § 11. Section 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security from him,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus." *Hertzberg,* 191 F.3d at 1081

(quoting 15 U.S.C. § 77*l* (a)(2)). As the Ninth Circuit noted in *Hertzberg,* § 12(a)(2) standing will not exist where there purchase is only traceable to the offering. *Id.; see Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 578, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (noting, in dicta, that suit under § 12 may only maintained by a person who purchases the stock in the public offering under the prospectus).

There is no clear appellate authority as to whether aftermarket purchasers may have § 12(a)(2) standing. Some courts have held that it does not exist for those who purchase securities in private and secondary markets outside the initial offering. *See In re Sterling Foster & Co., Inc., Sec. Litig.,* 222 F.Supp.2d 216, 244–45 (S.D.N.Y.2002) (collecting cases within S.D.N.Y); *Tsirekidze v. Syntax–Brillian Corp.,* No. CV–07–02204–PHX–FJM, 2009 WL 2151838, at *2 (D.Ariz. July 17, 2009). Other courts, such as *Feiner v. SS & C Tech., Inc.,* 47 F.Supp.2d 250, 253 (D.Conn. 1999), have held that aftermarket purchases are actionable "so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'" *Id.* (quoting 15 U.S.C. § 77*l*); *see In re Levi Strauss & Co. Sec. Litig.,* 527 F.Supp.2d 965, 982 (N.D.Cal.2007). In *Levi Strauss,* the court clarified that *Feiner* only goes so far as to say that § 12(a)(2) liability is coextensive with the prospectus's effective date. *Levi Strauss,* 527 F.Supp.2d at 983. "This period is generally forty days, but extended to ninety days if the public offering is the issuer's initial public offering of securities." *Id.* Even under this more expansive reading of § 12(a)(2), Plaintiffs fail to state a claim as to the 2006 offerings.

Pompano is alleged only to have purchased Floating Rate Notes "on and/or

---

5. Plaintiffs also lack § 12(a)(2) standing to pursue claims as to the 5.50% Notes issued in

the August 2006 offering, as explained *supra.*

traceable to" the August 2006 offering. (¶ 11.) The Certification in the Complaint shows that Pompano did not purchase the Floating Rate Notes until January 12, 2007, over four months after the initial offering. This falls outside the effective date for the prospectus. *See Levi Strauss,* 527 F.Supp.2d at 983. Despite opportunity to clarify how Pompano has standing, Plaintiffs have failed to show how this purchase was made pursuant to an effective prospectus. The Court GRANTS Defendants' motion on this issue and DISMISSES Plaintiffs' § 12(a)(2) claims related to the August 2006 offering.

Similarly, Plaintiffs have failed to allege that Seymour purchased the Series K Preferred Stock pursuant to a misleading prospectus. To the contrary, Plaintiffs have alleged that Seymour's purchase was only "traceable to" the September 2006 offering. (¶ 12.) This is insufficient to assert § 12(a)(2) standing. *See Hertzberg,* 191 F.3d at 1081. The Court GRANTS Defendants motion on this issue and DISMISSES Plaintiffs' § 12(a)(2) claims related to the September 2006 offering. However, Plaintiffs have standing to pursue § 12(a)(2) claims as to the December 2007 offering. Detroit P & F purchased shares of Series R Stock directly in the initial offering on December 17, 2007. (*Compare* ¶ 14 *with* Compl. at 287.) Defendants' motion on this issue is DENIED.

## C. *Count Six: Section 15 of the Securities Act*

As explained in the prior Order, the Outside Director Defendants and Defendants Killinger, Casey, Woods, and Ballenger are sufficiently alleged to be control persons for the purpose of § 15 liability. Control liability extends to those claims now successfully pleaded under §§ 11 and 12(a)(2). (*See* ¶¶ 861–64.) Defendants' motion is DENIED as to those claims in Counts Four and Five which survive dis-

missal and is GRANTED as to those which do not.

## Conclusion

Plaintiffs have largely succeeded in remedying the deficiencies of their initial Complaint. As to Killinger, nearly all of Plaintiffs' § 10(b) claims in Counts One and Two are adequately pleaded regarding false statements of risk management, appraisals, underwriting, financial statements, and internal controls. Defendants' motions on these claims are DENIED. However, two statements (¶¶ 60, 182) lack sufficient clarity to state a claim, as described above, and Defendants' motions related thereto are GRANTED. As to Casey, Rotella, Cathcart, and Schneider, all of Plaintiffs' § 10(b) claims in Counts One and Two are adequately pleaded as to all five areas of false statements, and Defendants motions are DENIED. Defendants' motions to dismiss Count Three are DENIED as to those § 10(b) claims which are adequately pleaded and GRANTED as to the two statements made by Killinger that fail to state a claim for relief.

Defendants' motions to dismiss Count Four are DENIED as to the August 2006, September 2006, and December 2007 offerings for those securities actually purchased by the named plaintiffs. Because Plaintiffs do not have standing to pursue claims related to the 5.50% Notes, Defendants' motions to dismiss these claims in Count Four are GRANTED. Defendants' motions to dismiss Count Five are GRANTED as to the August 2006 and September 2006 offerings, including the 5.50% Notes, because Plaintiffs lack standing under § 12(a)(2) to pursue those claims. Plaintiffs' claims in Count Five related to the December 2007 offering, however, are adequately pleaded and Defendants' motions to dismiss these claims are DENIED. Defendants' motions to dismiss Count Six are DENIED as to those claims in Counts

Four and Five that are adequately pleaded and GRANTED as to those claims that are not.

No later than two weeks from the date of this ruling, all parties to the MDL shall file a status report offering a proposed schedule for the resolution of this matter. (*See* Dkt. No. 363.) The schedule should base all proposed motions deadlines on a proposed trial date. The status report should also provide proposed discovery protocols. The Court suggests the parties consult the Federal Judicial Center's *Managing Discovery of Electronic Information: A Pocket Guide for Judges* (2007).

The Clerk is directed to send a copy of this order to all counsel of record.